IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Maxwell Pringle, et al.,                                        Case No. 3:06 CV 2985

                    Plaintiffs,            MEMORANDUM OPINION
                                        AND ORDER

      -vs-

                                        JUDGE JACK ZOUHARY

Continental Tire North America, Inc.,
   et al.,

                    Defendants.

      This is a case claiming "violation of labor contracts" and, specifically, the payment of medical benefits to retirees. Plaintiffs include Maxwell Pringle ("Pringle") and other named individuals (collectively, the "Class Representatives") on behalf of a class (the "Class").  Plaintiffs define the Class as "now-retired former employees of CTNA (hereinafter 'Retirees'), as well as spouses and surviving spouses of both these Retirees and long-term employees who died during the time they were employed leaving spouses eligible for retiree medical coverage" (2d Am. Compl. at ¶ 1).  An additional Plaintiff is the United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("the Union"). Plaintiffs brought suit against Continental Tire North America, Inc. ("CTNA"), the Group Insurance Plan (the "Plan") that sponsors and administers medical benefits, and John Does one through twenty.  Plaintiffs and Defendants each moved for summary judgment.  Plaintiffs also moved to dismiss a Counterclaim by Defendants against the Union for breach of contract.

**BACKGROUND**

CTNA makes and distributes tires for autos.  CTNA purchased General Tire, Inc. in 1987 and thereby acquired several manufacturing facilities.  (Both CTNA and General Tire maintained headquarters in Akron, Ohio.)  Those facilities were located in Charlotte, North Carolina; City of Industry, California; Mayfield, Kentucky; Waco, Texas; and Bryan, Ohio. The Union represents employees at the Charlotte facility which continues to operate in some capacity.  The Union formerly represented employees at the City of Industry, Mayfield, Waco and Bryan plants, which are no longer operated by CTNA.

CTNA, upon purchasing the various plants, assumed liabilities for medical benefits for employees who retired after November 30, 1984. Each of the Class Representatives retired from one of the facilities purchased by CTNA.

CTNA and the Union negotiated the issue of retiree medical benefits through site-by-site Pension and Insurance Agreements ("P&I Agreements") that were similar across plants. The P&I Agreements stipulated that eligible retirees and their eligible spouses would receive healthcare benefits without having to pay any premium contribution (*see*, *e.g.*, 1990 Bryan P&I Agreement).

Beginning in 1992, however, CTNA and the Union entered into a series of amendments to the P&I Agreements, known as "cap letters" (or Financial Accounting Standard (FAS)-106 Letters). Implemented in 1991, FAS-106 was "an accounting rule requiring companies to report all post-retirement benefit obligations other than pensions on their balance sheets instead of on a pay-as-you-go basis." *United Steelworkers of America v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 274 n.5 (6th Cir. 2007). By setting a cap on retiree healthcare liabilities, companies "safeguarded against having to report astronomical amounts in liabilities." *Id.*

2

Those letters capped CTNA's annual contributions to retirees' medical care. Between 1993 and 2005, CTNA and the Union entered into cap letters for every P&I Agreement that they had signed. The letters specified that the caps on retiree medical benefits would only go into effect after the expiration of the applicable collective bargaining agreement ("CBA") (*see*, *e.g.*, Ledsinger Dec. Ex. 2).

In 2005, CTNA and the Union began negotiating a successor CBA. Although CTNA sought to reduce its contributions to retirees, no agreement was reached. On May 1, 2006, CTNA unilaterally implemented portions of its final bargaining proposal, including a $3,000 cap on its contribution to medical coverage for Charlotte retirees (to take effect in 2007), which was lower than the agreed-upon cap previously in effect.

Thereafter, CTNA indefinitely suspended production in Charlotte, and in fall 2006, CTNA and the Union entered into effects bargaining.  Effects bargaining over the Mayfield and Bryan plants began in October 2006.  The next month, CTNA informed retirees in Bryan, Mayfield, Waco and City of Industry that it was lowering caps for all current and future retirees of CTNA for those locations effective April 1, 2007.  This lawsuit followed.

The Complaint consists of two claims: (1) violation of labor agreements under Section 301 of the Labor Management Relations Act ("LMRA"); and (2) violation of an employee welfare benefit plan under the Employee Retirement Income Security Act ("ERISA") § 502(a)(1)(B) and (a)(3). Plaintiffs request the Court certify the Class; declare that retiree health benefits, as set forth in the applicable agreements, may not be unilaterally modified by Defendants; enjoin Defendants from modifying or terminating the retiree benefits; and award money damages to the Class.

3

## DISCUSSION

Defendants argue they are entitled to summary judgment on all of Plaintiffs' claims. First, they assert the Section 301 claim fails based on unambiguous language of the CBA.  Second, they argue the ERISA claim automatically fails as a result of their inability to prove a Section 301 claim. Finally, Defendants argue the Union is estopped from bringing the present action because it previously released CTNA from all liability (Defendants' Counterclaim against the Union alleges breach of the contractual release).

Plaintiffs also moved for summary judgment on all claims. They assert the medical benefits in question were vested through successive agreements with CTNA and that the Company's unilateral decrease of contribution caps violates those agreements. Plaintiffs likewise moved to dismiss Defendants' Counterclaim on the basis that the Union did not breach any contractual release by bringing this suit.

The heart of this dispute rests on the language and import of the P&I Agreements and the cap letters that followed.  Although Plaintiffs put forth extrinsic evidence in the event that the Court finds the agreements ambiguous, that evidence was stricken by a previous Order of this Court (Doc. No. 92).  Defendants also point to extrinsic evidence -- the parties' bargaining history -- as evidence that Plaintiffs' rights to medical benefits never vested.  However, both sides claim the unambiguous meaning of the agreements (and letters) supports their respective positions.  Because the intent and language are clear, the Court need not resort to extrinsic evidence.

4

## I.    PLAINTIFFS' SECTION 301 CLAIM

Defendants argue that, absent a commitment from a CBA, an employer should not be expected to provide medical benefits to retirees (Mot. for Summ. J. at 12). Defendants' basic position is that the agreements between the Union and CTNA expired and, after good faith negotiations on the subject failed, CTNA was free to adjust benefits caps downward.

Defendants also raise several arguments to counter the claim that Plaintiffs' rights were "vested" through the P&I Agreements. First, they argue that the idea of vesting is "belied by the existence of these caps in the first instance," and that retirees were on notice that "they would be responsible for any health insurance costs above and beyond [CTNA's] specified contribution levels" (Mot. for Summ. J. at 14-15). Second, Defendants assert retiree medical benefits were a mandatory subject of bargaining, meaning that both the Union and CTNA realized that such benefits were subject to change. Third, Defendants claim that language in the P&I Agreements, namely that all benefits would terminate ninety days after the expiration of the agreements, indicates that such medical benefits were not vested (Mot. for Summ. J. at 16-17).

Plaintiffs themselves move for summary judgment on their Section 301 claim and provide several arguments for finding that retiree medical benefits were vested: (1) "substantially identical" provisions in successive labor agreements stating that Plaintiffs "shall receive the benefits" (Cross-Motion to Dism. at 2); (2) the agreements' linking of medical benefits to pension benefits, especially in the absence of any "reservation of rights" clauses (Cross-Motion to Dism. at 2-3, 12-14); (3) the insurance documents at issue establish conditions for termination or suspension of benefits for active employees "while those conditions were typically inapplicable to retirees" (Cross-Motion to Dism. at 3, 6, 15-18) (citing *Gilbert v. Doehler-Jarvis, Inc.*, 87 F. Supp. 2d 788, 791 (N.D. Ohio 2000)); and

5

(4) the plain language of the FAS-106 letters suggest that benefits were vested for life (Cross-Motion to Dism. at 18-20).

Plaintiffs also refute that the use of the word "mandatory" in FAS-106 letters negotiated at some plants affected the vesting of medical benefits (Cross-Motion to Dism. at 4, 20-25). Plaintiffs contend that, according to its plain language, the "mandatory subject of bargaining" provision meant only that both parties were obligated to discuss caps upon the expiration of a CBA. The "mandatory" language could not possibly mean, however, that Defendants were free to alter caps without the Union's permission.

### A.   VESTING OF RETIREE BENEFITS UNDER SIXTH CIRCUIT LAW

Several decisions within the Sixth Circuit have laid out the correct approach for determining whether retiree benefits exist beyond the expiration of a CBA. Many of them, including *Maurer v. Joy Technologies*, 212 F.3d 907, 914-15 (6th Cir. 2000), rely on the following language from *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479-80 (6th Cir. 1983):

> Whether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties. Clearly the parties to a collective bargaining agreement may provide for rights which will survive termination of their collective bargaining relationship. The parties may, for example, provide retiree insurance benefits which survive the expiration of the collective bargaining agreement. Any such surviving benefit must necessarily find its genesis in the collective bargaining agreement.
>
> The enforcement and interpretation of collective bargaining agreements under § 301 is governed by substantive federal law. However, traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies. Many of the basic principles of contractual interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements. For example, the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be constructed consistently with

6

the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises.

*Maurer*, 212 F.3d at 914-15 (quoting *Yard-Man*, 716 F.2d at 1479-80 (citations omitted)); *see also*

*Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578-79 (6th Cir. 2006) (applying *Yard-Man*).

In a situation where retiree benefits are vested, the retiree receives the benefits laid out in the CBA in effect when he or she retired. *Yolton*, 435 F.3d at 581 ("the retirement package available to someone contemplating retirement will change with the expiration and adoption of CBAs, but someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself"). Otherwise, retiree benefits, which are "typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." *Yard-Man*, 716 F.2d at 1482.

In determining whether a CBA vests benefits in retirees, courts have looked to a variety of factors. The tying of retiree medical benefits to pension eligibility has been used to help determine that benefits are vested. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 656 (6th Cir. 1996). Also, "specific durational limits" for non-retired workers, even in the face of a general durational clause for all benefits (including those not relating to retirees), has also been used as evidence that retiree benefits had no durational limit (i.e., were vested). *Yolton*, 435 F.3d at 581-82. Finally, retiree benefits are "in a sense 'status' benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained." *Yard-Man*, 716 F.2d at 1482. Therefore, there is an "inference," but not a "presumption," that "the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Williams v. WCI Steel Co.*, 170 F.3d 598, 605 (6th Cir. 1999) (quoting *Yard-Man*, 716 F.2d at 1482).

7

### B.     THE P&I AGREEMENTS

Before the issuance of cap letters in 1992-93, the P&I Agreements then in effect clearly and unambiguously, in plain language, stated that eligible employees "shall . . . receive" the described medical benefits after retirement (*see*, *e.g.*, Ledsinger Dec. Ex. 6).  Several additional factors support this meaning that the parties intended benefits to vest.

First, the P&I Agreements tied retiree medical benefits to pension eligibility. For instance, the 1991 Mayfield P&I Agreement read, in relevant part, as follows: "Employees hired after October 15, 1988, and who retire after completion of at least 20 years of continuous service and who are eligible for a pension (other than a Deferred Vested Pension), **shall** receive the benefits described" (emphasis added) (Stember Dec. Ex. 29).  According to the P&I Agreements, benefits varied depending on whether the employee worked less than ten years, more than ten years, or more than twenty years. In each case, however, the benefits were contingent upon pension eligibility. *Id.*

Second, whereas specific durational limits existed for medical benefits to non-retirees under the pre-cap P&I Agreements, there were **no** such limits set out for retirees. That disparity, even in the face of a general durational clause stating that benefits would expire within a short period after the expiration of the agreement, supplies further evidence of vesting. *Yolton*, 435 F.3d at 581-82.

Finally, the very fact that the benefits at issue belong to retirees creates an inference (but not a presumption) that such benefits are "intended . . . to continue as long as the beneficiary remains a retiree." *Yard-Man*, 716 F.2d at 1482.

Therefore, the unambiguous language of the agreement necessitates a finding of summary judgment in favor of those employees who retired prior to the issuance of cap agreements at their

8

respective facilities. *Yolton*, 435 F.3d at 581. Defendants may not unilaterally cancel or impose modified medical benefits to those retirees.

### C.    THE CAP LETTERS

Defendants claim the cap letters indicate that retiree medical benefits were not vested. Those letters, included as part of the successive P&I Agreements, provide that caps shall be placed on CTNA's contributions to retirees. As an example, Defendants point to language in the 1999 Charlotte cap letter, which limits the Company's average contribution to $18,000 for retirees and surviving spouses under the age of 65 and $4,200 for retirees and surviving spouses over the age of 65 (Ledsinger Dec. Ex. 8).

Defendants argue that the cap letters group together all retirees, current and future. For instance, the Company determines its contribution for "each group" (over 65 and under 65, respectively) by "taking the total annual healthcare payments made by the Company for each group separately and dividing each amount by the average number of retired Employees and surviving spouses in such group for that year" (Ledsinger Dec. Ex. 8).

Defendants also point to other portions of the cap letters to support their interpretation. Some of the later cap letters, such as the 1999 Charlotte cap letter, stipulate that "[d]uring the respective plant re-openers for Charlotte, Bryan and Mayfield, the FASB Cap amounts shall be revised based on a fair and reasonable evaluation of actuarial data applicable to the hourly employees at the respective plants" (Ledsinger Dec. Ex. 8). Many of the later cap letters also contain the following provision: "[n]otwithstanding Pittsburgh Plat[e] Glass or any board or Court decision to the contrary, the parties agree that this letter shall be considered a mandatory subject of bargaining in any subsequent negotiations occurring after September 20, 1999" (Ledsinger Dec. Ex. 8).

Defendants argue then that these cap letter provisions reveal that the caps were not vested. For instance, an employee who retired in 2000 under the 1999 Charlotte cap letter would know that he would become part of a "group," and lumped together with retirees over 65 years of age who retired after him. If he anticipated seeking Company contributions for medical care in 2008, he would know that benefits would be capped and perhaps adjusted based on "actuarial data." Finally, he would know that caps were a subject of mandatory bargaining and could change based on a later agreement of the parties, or even at the unilateral action of the Company if the parties were at impasse.

Plaintiffs question the significance of these provisions. First, Plaintiffs argue the "mandatory" provision requires only that Plaintiffs meet and discuss the issue -- not that Defendants have the unilateral right to adjust cap levels. Second, Plaintiffs contend that the "actuarial data" provision preserved only the ability to **increase** caps. Since healthcare costs have historically risen over the relevant time period, those financial reevaluations made it possible to adjust the caps upward to account for the rising cost of care.

### 1.    GENERAL CONSIDERATIONS

The same factors that would tend to indicate vesting under the P&I Agreements are relevant as well in the context of cap letters. Those cap letters must be read in the context of the larger P&I Agreement. *Yard-Man*, 716 F.2d at 1479 ("The court should also interpret each provision in question as part of the integrated whole."). Even after the parties began using cap letters to limit Company contributions, medical benefits to retirees were still tied to pension benefits, still had no clear durational limit, and they were still, in essence, a "status benefit."

10

### 2.    THE PITTSBURGH PLATE GLASS PROVISION

Several of the later cap letters provide that "[n]otwithstanding Pittsburgh Plat[e] Glass or any board or Court decision to the contrary, the parties agree that this letter shall be considered a mandatory subject of bargaining in any subsequent negotiations occurring after September 20, 1999" (Ledsinger Dec. Ex. 8). While this provision indeed made it mandatory for the Union to bargain with CTNA over benefits caps, it did not suddenly divest employees of previously vested retiree benefits.

The terms "permissive" and "mandatory" are used to describe the duties laid out in Section 8 of the National Labor Relations Act ("NLRA"). 29 U.S.C. § 158; *N.L.R.B. v. Plainville Ready Mix Concrete Co.*, 44 F.3d 1320, 1326 (6th Cir. 1995). That statute establishes the "mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." *Id.* at § 158(d). As a result, the "wages, hours, and other terms of employment" of a company's "employees" are considered mandatory subjects of bargaining, while other labor-related issues are considered permissive subjects of bargaining. If one party wishes to discuss a permissive subject after the expiration of the CBA, the Company and Union "may bargain about that subject," but only "by mutual consent." *Taylor Warehouse Corp. v. N.L.R.B.*, 98 F.3d 892, 902 (6th Cir. 1996).

The case cited in the cap letter provision, *Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 187-88 (1971), held that the issue of current retiree benefits is a permissive rather than mandatory subject of bargaining according to statute. The Court reasoned that retired workers are not "employees" as contemplated by the NLRA, and that the mandatory bargaining rule did not apply to issues involving retired workers. *Id.* at 172.

11

Should the Company and Union "meet at reasonable times and confer in good faith," and comply with notice and other requirements listed in the statute, a mandatory obligation to bargain is fulfilled. If both sides reach impasse despite a good faith bargaining effort, the employer may then unilaterally impose changes that are "'reasonably comprehended within his pre-impasse proposals' and consistent with the offers the Union has rejected." *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 449 (6th Cir. 1999). The employer's right to unilateral change, however, only extends to certain subjects: "wages, hours, and other terms and conditions of employment" (the same subjects termed "mandatory"). *Taylor*, 98 F.3d at 902.

The plain language of the mandatory bargaining provision in the cap letters suggests that both parties were obligated to sit down together and exchange proposals, as opposed to bargaining "by mutual consent." *Taylor*, 98 F.3d at 902. Defendants' preferred interpretation -- that the provision grants them the right to impose unilateral changes to retiree benefits -- would have to be implied.

Yet the implication that Defendants hope to hoist onto the contracts conflicts with the totality of the agreements and would render the benefits illusory. *See In re Ormet Corp.*, 324 B.R. 646, 654 (Bankr. S.D. Ohio 2005) (finding retiree benefits to be vested despite similar "mandatory subject of bargaining" language in cap letters). The P&I Agreements vested the medical benefits of employees who retired prior to the issuance of cap letters. To now suggest that those benefits become divested by implication makes little sense in the context of the larger agreement. After all, a union "may not . . . bargain away retiree benefits which have already vested in particular individuals." *Yard-Man*, 716 F.2d at 1482 n.8. CTNA's argument that medical benefits for all current and future retirees were subject to unilateral change contradicts this explicit rule of *Yard-Man*.

12

Moreover, Defendants' interpretation would render the caps illusory. If the benefits caps were not to take effect until after the expiration of the CBA, but those caps were subject to unilateral alteration by CTNA after the CBA expired, then it would make little sense for the parties to agree to any particular level of benefits caps in the first place. Setting the caps at $18,000 and $4,200, respectively, would not make sense if, the moment those caps were intended to go into effect, they could be unilaterally decreased. Defendants' interpretation fails because, when dealing with CBAs, one "should construe terms 'so as to render none nugatory and avoid illusory promises.'" *McCoy v. Meridian Auto. Sys.*, 390 F.3d 417, 422 (6th Cir. 2004) (citing *Yard-Man*, 716 F.2d at 1479-80).

### 3. THE "ACTUARIAL DATA" PROVISION

Some later cap letters indicate that "[d]uring the respective plant re-openers for Charlotte, Bryan and Mayfield, the FASB Cap amounts shall be revised based on a fair and reasonable evaluation of actuarial data applicable to the hourly employees at the respective plants" (Ledsinger Dec. Ex. 8). This provision clearly applies to those who were, at the time of its writing, active employees of the Charlotte, Bryan and Mayfield plants. As a result, this provision alone cannot single-handedly divest the benefits of current retirees.

Even assuming, *arguendo*, that the "actuarial data" provision could affect the benefits of current retirees, Defendants' argument would be undone. This provision must also be read in tandem with the "mandatory" language in the cap letters where the issue of retiree benefits would be "mandatory" only in the sense that the parties were obligated to bargain. However, CTNA would not have the power to revise caps unilaterally in the event that the parties didn't agree.

13

## II.    PLAINTIFFS' ERISA CLAIM

Defendants argue that they must prevail on Plaintiffs' ERISA claim if Defendants are awarded summary judgment on Plaintiffs' Section 301 claim. According to Defendants, an employer "violates ERISA by changing the terms of a retiree health benefit plan only if it has previously agreed to vest rights under such a plan" (Mot. for Summ. J. at 25).  If Plaintiffs cannot show that their rights to such benefits were vested, Defendants believe they must prevail on the ERISA claim.

Defendants also contend that summary judgment in their favor is appropriate, at least for CTNA, if Plaintiffs' ERISA claim is based on breach of ERISA fiduciary duties (Mot. for Summ. J. at 26 n.7). Since CTNA is merely a sponsor of the Group Insurance Plan, Defendants argue CTNA's actions in decreasing benefits caps "do not constitute fiduciary acts" (Mot. for Summ. J. at 26 n.7). Plaintiffs do not dispute this point.

Both parties cite *Yolton v. El Paso Tennessee Pipeline Co.,* 435 F.3d 571 (6th Cir. 2006), in support of their arguments.  In *Yolton*, the Sixth Circuit held that "[i]f a welfare benefit has not vested, after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA." *Id.* at 578.  As expressed in *Yolton*, whether the rights of the retirees have been vested prior to any CBA modifications is essential in determining an LMRA violation and, hence, an ERISA violation as well. *Id.*

Defendants explicitly admit that Plaintiffs' ERISA claim against the Plan "rises and falls with their Section 301 claim" (Defs. Reply in Supp. of Mot. for Summ. J. at 14). Therefore, since Plaintiffs are granted summary judgment on their Section 301 claim, they shall also be granted summary judgment on their ERISA claim against the Plan.

### III.    RELEASE OF UNION'S CLAIMS

Even if all Defendants' previous arguments fail, Defendants contend they are entitled to summary judgment because the Union agreed not to bring or support any claims against CTNA. Defendants assert that the Union, in signing Closing Agreements (a.k.a. "Effects Bargaining Agreements") for the Bryan and Mayfield plants, released Defendants from any such claims arising under the P&I Agreements for those facilities. Plaintiffs' alleged breach of the contractual releases is also the subject of Defendants' Counterclaim, in which Defendants' assert the Union breached the releases by bringing this suit.

Plaintiffs disagree with Defendants' interpretation of the Closing Agreements and also move to dismiss Defendants' Counterclaim. Plaintiffs counter that the Union's release of CTNA in the Bryan and Mayfield Closing Agreements does not prevent them from participating in this case. Specifically, Plaintiffs point to language in those agreements stating that retirees (as of the closing date) and their benefits would not be affected. Also, Plaintiffs argue their claims arose after the releases were signed, and these claims were not anticipated by the Closing Agreements.

The Closing Agreements at issue terminated the CBAs in place at the Bryan and Mayfield plants, instituting new provisions for relations between the Union and CTNA (Ledsinger Dec. Ex. 26, 27). Both agreements unambiguously carve out the issue of retiree benefits. The Bryan Effects Bargaining Agreement states, in relevant part:

> **Current Retirees:** The Parties acknowledge that they did not bargain over the subject of pensions or medical benefits or any other benefits provided by CTNA to individuals other than those persons who are Employees as of the Closing Date and that this Agreement in no way impairs or enhances any obligations of CTNA toward current retirees and their eligible dependents.

Similarly, the Mayfield Effects Bargaining Agreement reads as follows:

15

**Current and Future Retirees:** The Parties acknowledge that, in the negotiation of this Agreement, they did not bargain any changes to the pensions, retiree medical benefits or any other post-retirement benefits provided by CTNA to current or future Mayfield retirees (or their eligible dependents), and that this Agreement in no way impairs or enhances any obligations of CTNA toward current and/or future retirees and their eligible dependents. In any future dispute between the parties over any aspect of such benefits, nothing in this Agreement shall be construed to impair or enhance any argument of either party.

Both agreements clearly state that their provisions would have no effect on issues relating to retiree benefits. For that reason, the Union is permitted to join or support this lawsuit.

In a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court may consider documents that are referred to in a complaint and central to the claim being asserted. *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999). Taking into account the unambiguous language of the Closing Agreements, there is no set of facts that Defendants could rely upon to prove their Counterclaim. As a result, Defendants' Counterclaim will be dismissed. For the same reasons, Defendants' Motion for Summary Judgment will be denied to the extent it relies on the Closing Agreements' preclusive effect.

## CONCLUSION

For the foregoing reasons, it is hereby ordered that Plaintiffs' Motion for Summary Judgment (Doc. No. 67) is granted with respect to: (1) Plaintiffs' Section 301 claim against all Defendants; and (2) the Class Representatives' ERISA claim against the Group Insurance Plan. To the extent that Plaintiffs' ERISA claim against CTNA is for breach of fiduciary duties, Plaintiffs' Motion for Summary Judgment is denied; and

Plaintiffs' Motion to Dismiss Defendants' Counterclaim is granted (Doc. Nos. 67, 97); and

16

Defendants' Motion for Summary Judgment (Doc. No. 56) is granted to the extent that Plaintiffs' ERISA claim against CTNA is for breach of fiduciary duties, and denied in all other respects.

IT IS SO ORDERED.

_____s/ Jack Zouhary_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

July 31, 2007

17